UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| SHIRLEY TROTTER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:23-cv-01065-RLY-TAB |
| | ) | |
| BRANDON LOGAN, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**Order Granting Defendants' Motion for Summary Judgment, Resolving Pending Motions, and Directing Entry of Final Judgment**

Following a high-speed chase in a stolen vehicle, decedent Carlos Trotter was shot by Defendant Officer Logan while reaching for his waistband multiple times. He later died at a nearby hospital.

In this action, Plaintiff, Mr. Trotter's estate, alleges four claims: (1) a Fourth Amendment excessive force claim against Officer Logan; (2) an assault and battery claim against Officer Logan; (3) a claim of *respondeat superior* liability against the City of Lawrence for Officer Logan's use of force; and (4) a *Monell* claim against the City for its deliberate indifference "to the extreme danger Officer Logan posed to the general public." Dkt. 59.

Defendants moved for summary judgment. Dkt. 61. The Estate responded in opposition. Dkts. 72, 73, 74, 80.

For the reasons that follow, Defendants' motion for summary judgment, dkt. [61], is **granted** and final judgment shall be entered. All pending motions, dkts. [77] and [86], are **denied as moot**.

1

## I.    Expert Testimony

As an initial matter, the court declines to consider either side's expert testimony in its review of the summary judgment motions due to the existence and designation of fifteen videos between the parties, all of which have clear video, and some of which have audio. There are no allegations or indications that the videos designated are altered or that their depictions differ from what happened on October 27, 2022.

"Where a reliable videotape clearly captures an event in dispute and blatantly contradicts one party's version of the event so that no reasonable jury could credit that party's story, a court should not adopt that party's version of the facts for the purpose of ruling on a motion for summary judgment." *McCottrell v. White*, 933 F.3d 651, 661 n. 9 (7th Cir. 2019) (citing *Scott v. Harris*, 550 U.S. 372, 380-81 (2007)).

Because the videos clearly tell the story of what happened during the incident, the court did not need to consider either side's expert in its review of the record on summary judgment. For that same reason, Defendants' motion to exclude Plaintiff's expert testimony, dkt. [77], and Plaintiff's motion for leave to file sur-reply in opposition to Defendants' motion to exclude Plaintiff's expert, dkt. [86], are both **denied as moot.**

## II.    Legal Standard

A motion for summary judgment asks the court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). When reviewing a motion for summary judgment, the court views the record and draws all reasonable inferences from it in the light most favorable to the nonmoving party. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572–73 (7th Cir. 2021). It cannot weigh evidence or make credibility determinations on summary judgment because

those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). A court only has to consider the materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3); it need not "scour the record" for evidence that might be relevant. *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 573−74 (7th Cir. 2017) (cleaned up).

A party seeking summary judgment must inform the district court of the basis for its motion and identify the record evidence it contends demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

### III.    Factual Background

Because Defendants have moved for summary judgment under Rule 56(a), the court views and recites the evidence in the light most favorable to the Estate and draws all reasonable inferences in its favor. *Khungar*, 985 F.3d at 572–73.

#### A.  The Parties

Plaintiff Shirley Trotter proceeds as the special administrator of the estate of Carlos Trotter ("Mr. Trotter"), the decedent. Defendant Officer Logan, at all times relevant to the complaint, was employed as a Lawrence Police Department ("LPD") officer by Defendant City of Lawrence. Dkt. 12 at 2.

#### B.  Walmart parking lot

In the afternoon of October 27, 2022, police dispatch alerted officers of a stolen vehicle at

3

42nd and Franklin on the Far Eastside neighborhood of Indianapolis. Ex. F at 00:40-1:00 (Investigative Interview, Officer Anderson); *see also* Ex. D at 1:30-1:45 (Bodycam, Officer Bishop).

Mr. Trotter was driving a stolen white Nissan Altima when LPD Officer Justin Rossillo stopped him in the parking lot of the Walmart on Pendleton Pike in Lawrence, Indiana. Dkt. 62-1[1] Ex. K at 0:00-2:10 (Dashcam, Officer Rossillo); Ex. N (LPD case report), dkt. 62-1 at 42-46; Ex. L (LPD incident report), dkt. 62-1 at 4-38. Several LPD vehicles were stopped behind the Altima. *Id.* Ex. A at 3:25 (Dashcam, Officer Anderson); Ex. C at 12:05 (Dashcam, Officer Bishop).

Officer Rossillo repeatedly told Mr. Trotter to roll down his window, but Mr. Trotter did not comply. Ex. A at 3:30-4:00; Ex. J at 2:06-3:08 (Bodycam, Officer Rossillo). Mr. Trotter fled the Walmart parking lot in the stolen Altima and officers from LPD, Indianapolis Metropolitan Police Department ("IMPD"), and the Indiana State Police ("ISP") quickly followed in pursuit. Ex. A at 4:00; Ex. C at 12:20, Ex. K at 2:10.

### C. High-speed chase from Walmart on Pendleton Pike to 30th and Shadeland

Dashcams from Officers Anderson, Bishop, Logan, and Rossillo captured the high-speed chase. Ex. A at 4:00-11:00; Ex. C at 12:00-20:00; Ex. H at 1:00-8:00 (Dashcam, Officer Logan); Ex. K at 2:00-10:00. The dashcam footage reveals several attempts by Mr. Trotter to evade law enforcement after exiting the Walmart parking lot, turning left into oncoming traffic heading westbound on Pendleton Pike. Ex. A at 4:35-4:42; Ex. M at 3 (ISP Incident Report), dkt. 62-1 at 41. ISP Trooper Henderson's report revealed initial speeds were approximately 47 miles per hour ("MPH") but accelerated to 90 MPH. Ex. M at 3, dkt. 62-1 at 41.

---

[1] Defendants filed a notice of manual filing, which includes videos labeled exhibits A-K, attached to Dkt. 62-1. Plaintiff also filed a notice of manual filing, which includes videos labeled Brandon Logan LAWRENCE_000750, Civilian Video LAWRENCE_000728, Cody Anderson LAWRENCE_000731, and Stuart Bishop LAWRENCE_000737. Dkt. 74. The Court has reviewed all of the video footage designated.

Mr. Trotter drove again into oncoming traffic and onto a grass median adjacent to a Crew Car Wash ("Crew"). Ex. A at 4:50-5:20. Mr. Trotter slowed down to let out two individuals at the Crew before speeding off again. *Id.* at 5:20-5:25. Mr. Trotter emerged back into the Crew parking lot, nearly hitting Officer Anderson's vehicle, *id.* at 5:35-5:40, and drove back on the grass median adjacent to the Crew, *id.* at 5:25-5:45. For the third time, Mr. Trotter sped into oncoming traffic back onto Pendleton Pike headed westbound, swerving between a box truck and a commercial van in the middle of an intersection, nearly causing two accidents. *Id.* at 5:45-6:00. Mr. Trotter sped down Pendleton Pike, cruising through red lights, and swerving around vehicles. *Id.* at 6:00-7:00. Mr. Trotter again sped into an intersection while the light was red, almost hit two vehicles in the process, and continued to speed away. *Id.* at 7:00-7:35.

Mr. Trotter then swerved into oncoming traffic and sped down the wrong side of the road before moving back to the correct side of the road at an intersection. *Id.* at 7:35-8:00. Mr. Trotter continued westbound on Pendleton Pike past the ramp to Interstate 465 and swerved around multiple vehicles before turning right into a grass median adjacent to a Waffle House. *Id.* at 8:00-8:50.

After Mr. Trotter looped around Waffle House, he darted across all lanes of Pendleton Pike into a large parking lot across the street, where he drove over multiple grassy medians while several police vehicles followed. *Id.* at 8:50-9:45; Ex. C at 17:18-18:20. Mr. Trotter turned left back onto Pendleton Pike headed westbound, until he turned left on Shadeland Avenue headed southbound, swerving and speeding through intersections while running red lights. Ex. A at 9:45-10:00. Mr. Trotter sped down Shadeland before turning left into oncoming traffic and getting stuck on a grass hill median near 3035 Shadeland Avenue. *Id.* at 10:00-10:57; Ex. L at 29.[2]

---

[2] The court takes judicial notice of the distance of the route between Walmart on Pendleton Pike to 3035 Shadeland to be 5.6 miles or approximately 16 minutes in average traffic according to Google Maps.

### D.  Stuck on the grass hill median at 3035 Shadeland

Mr. Trotter attempted to reverse the Altima backwards and off the hill as officers began to surround the vehicle. Ex. A at 10:57-11:00. Immediately, an officer yelled "out of the car" three times, then waited. *Id.* at 11:00-11:15. Mr. Trotter did not get out of the car. *Id.* Officer Anderson yelled "out of the car" once more, and other officers and he began to yell "hands." *Id.* Mr. Trotter put his hands up, *id.* at 11:15, then put them down, *id.* at 11:20, then put them back up, *id.* at 11:22, and back down, *id.* at 11:25. Mr. Trotter did not put his hands back up, despite an officer yelling "put your hands up" twice, and "hands" twice. *Id.* at 11:25-11:40. Officer Logan[3] yelled "put your hands in the air, keep them there," and Mr. Trotter put his hands up for two seconds, *id.* at 11:48, and put them back down. *Id.* at 11:50; *see id.* at 11:40-11:50. Officer Logan yelled "open the driver side door, driver" but Mr. Trotter did not. *Id.* at 11:50-12:25. Mr. Trotter then reached down and scooted up in his seat, as if to grab something out of his pocket. *Id.* at 12:25-12:28. He then put his hands back up before leaning over into the passenger seat and then putting his hands back up. *Id.* at 12:28-12:40.

### E.  Officers approach the vehicle

Officer Anderson retrieved the ballistic shield from his vehicle. Ex. B at 11:20-12:00 (Bodycam, Officer Anderson). Officers Anderson and Logan approached the vehicle, with Officer Anderson behind the ballistic shield and Officer Logan following behind him. Ex. A at 12:40-12:41.

---

[3] The court identifies this to be Officer Logan based on his own bodycam footage audio: "put your hands in the air, keep them there," dkt. 62-1 Ex. I at 8:00-8:04, and "open the driver side door, driver," *id.* at 8:07-8:10.

### F.  At the vehicle and use of force

Officer Anderson opened the driver side door of the Altima. *Id.* at 12:41-12:43. Officer Logan, firearm raised, instructed Mr. Trotter to get out of the car. *Id.* at 12:41-12:42. Officer Bishop approached the Altima with his K-9 on a lead. *Id.* 12:44-12:46; Ex. D at 11:42-11:48. Due to the Altima's front end being up a small hill, the door closed as the K-9



approached. Ex. A at 12:44-12:46. Officer Bishop attempted to pull the door open, but Mr. Trotter pulled it shut. *Id.* 12:46-12:47.

Mr. Trotter then put his hands up for two seconds before dropping them again. Ex. B at



12:12-12:14. Officer Bishop pulled the door back open while Mr. Trotter rolled down the window. *Id.* at 12:16-12:17. The K-9 jumped at Mr. Trotter and bit at, and ripped, his shirt sleeve. *Id.* at 12:17-12:20. Mr. Trotter attempted to kick the dog. *Id.* at 12:19-12:21. The dog retreated from the vehicle. *Id.* at 12:21. Mr. Trotter reached his left arm across his body to his right hip and waistline area several times in

*Id.* at 12:21 (top photo).
*Id.* at 12:21 (bottom photo)

a span of six seconds. *Id.* at 12:21-12:27.

7

Contemporaneous with Mr. Trotter reaching for his waist, *see id.*, Officer Logan stated "hey, he got a gun" and Officer Anderson yelled "stop reaching." Ex. I at 9:00-9:10 (Bodycam, Officer Logan). Officer Brooks also reported Mr. Trotter putting his hands in his waistband. Ex. G at 15:30-15:40 (Investigation Interview, Officer Brooks); Ex. E at 2:40-2:50 (Bodycam, Officer Brooks).



Officer Logan fired one shot which struck Mr. Trotter in the abdomen. Ex. B at 12:28; Ex. I at 9:10-9:11.

*Id.* at 12:22 (top photo).
*Id.* at 12:24 (lower left photo).
*Id.* at 12:25. (lower middle photo
*Id.* at 12:25 (lower right photo)





8

  

### G. Removal from vehicle

> *Id.* at 12:25 (left).
> *Id.* at 12:26 (middle)
> *Id.* at 12:26 (right, holding onto and stretching out clothing nearly 2 seconds prior to shots fired)

After the shot was fired, Officers repeatedly yelled for Mr. Trotter to get out of the car. Ex. I at 9:10-9:35. The K-9 pulled Mr. Trotter from the Altima and officers placed him face down and cuffed his hands behind his back. *Id.* at 9:35-10:15. The officers located Mr. Trotter's gunshot wound, applied pressure, and applied a chest seal. *Id.* at 10:15-11:20. The officers encouraged Mr. Trotter to keep breathing, laid him on his side, and evaluated whether there was an exit wound while medics were on the way. *Id* at 11:20-12:20. Medics arrived shortly after. Ex. B at 18:08-19:00.

### H. Knife retrieved from vehicle

Officer Brooks observed a "huge knife laying in the floorboard of the driver's side of the vehicle." Ex. G at 16:20-16:30. After Mr. Trotter was removed from the car, officers found the

9

knife. The knife, pictured below, was captured most clearly on camera by Officer Anderson's bodycam. Ex. B at 17:12. Officer Anderson attests that he saw a knife in the front waistband of Mr. Trotter. *Id.* at 13:08-13:15. Officer Brooks observed a black knife sheath on his waistband when he rolled Mr. Trotter over after he was removed from the vehicle. Ex. G at 15:51-16:30.



## IV.    Discussion

### A.  Excessive Force against Officer Logan

"A police officer's use of deadly force is a seizure within the meaning of the Fourth Amendment and accordingly must be reasonable." *Muhammed v. City of Chicago*, 316 F.3d 680, 683 (7th Cir. 2002) (citing *Tennessee v. Garner*, 471 U.S. 1, 7(1985)). Determining whether the force used to effect a seizure is reasonable requires a balancing of "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham v. Connor*, 490 U.S. 386, 396 (1989) (quotation marks omitted) (quoting *Garner*, 471 U.S. at 8).

Courts must consider the severity of the underlying crime, whether the suspect posed an immediate threat to the officers' or others' safety, and whether the suspect was resisting arrest or fleeing. *See id.* (citing *Garner*, 471 U.S. at 8–9). "Deadly force may be used if the officer has

probable cause to believe that the armed suspect (1) 'poses a threat of serious physical harm, either to the officer or to others,' or (2) 'committed a crime involving the infliction or threatened infliction of serious physical harm' and is about to escape." *Muhammed*, 316 F.3d at 683 (quoting *Garner*, 471 U.S. at 11–12).

Courts assess the totality of the circumstances "from the 'perspective of a reasonable officer on the scene,'" not with the benefit of hindsight. *Id.* (quoting *Graham*, 490 U.S. at 396). In doing so, courts consider "the information known to the officer at the time of the encounter; the duration of the encounter; the level of duress involved; 'and the need to make split-second decisions under intense, dangerous, uncertain, and rapidly changing circumstances.'" *Siler v. City of Kenosha*, 957 F.3d 751, 759 (7th Cir. 2020) (first quoting *Horton v. Pobjecky*, 883 F.3d 941, 950 (7th Cir. 2018); and then citing *Graham*, 490 U.S. at 396–97). The court must remember that field encounters often require law enforcement officers to make split-second decisions in quickly unfolding, highly stressful situations. *Manery v. Lee*, 124 F.4th 1073, 1079 (7th Cir. 2025).

### i. Objective reasonableness

#### 1. Severity of crime

On October 27, 2022, Mr. Trotter was actively driving a stolen vehicle, a level 6 felony in the State of Indiana, when officers initially attempted to apprehend him in a Walmart parking lot. Ind. Code §§ 35-43-4-2; 35-43-4-3; Ex. N, dkt. 62-1 at 42-46; Ex. K at 0:01-2:10; Ex. F at 00:40-1:00; Ex. D at 1:30-1:45. Mr. Trotter committed another level 6 felony when he sped off and fled the initial traffic stop. Ind. Code § 35-44.1-3-1. The court finds these crimes to be serious, and this factor weighs in favor of Officer Logan. *See Johnson v. Scott*, 576 F.3d 658, 659 (7th Cir. 2009) (finding a "reckless flight from the police in a vehicle" to be a "serious" crime).

## 2. Immediate threat to the officers' or others' safety

Officer Logan argues that the second factor weights in his favor because Mr. Trotter was actively reaching toward his waistband. Dkt. 64 at 11-13. The Estate argues that the court should discredit Officer's Logan's account of the events. Dkt. 80 at 12-15. The court acknowledges that, unfortunately, Mr. Trotter, "the person most likely to rebut the officers' version of events," cannot testify because he was killed. *King v. Hendricks Cnty. Comm'rs*, 954 F.3d 981, 985 (7th Cir. 2020) (quoting *Cruz v. City of Anaheim*, 765 F.3d 1076, 1079 (9th Cir. 2014)). The court agrees with the Estate, to the limited extent that the overwhelming video evidence designated by the parties best depicts the events at issue in this case.

The Estate also argues that the officers caused the movements that were later used to justify force. Dkt. 80 at 15-19. The court agrees, but only to the extent that the use of the K-9 was gratuitous and seemingly unhelpful. But the Estate did not sue the handler of the K-9, Officer Bishop. He is a non-party. So, the court need not opine on Officer Bishop's handling of the K-9 in this case and limits its analysis to evaluate whether Officer Logan's use of force was objectively reasonable.

The key inquiry here is whether a reasonable officer under the same circumstances would have believed that Mr. Trotter posed an imminent threat of serious physical harm to Officer Logan and the other law enforcement present.

Here, the undisputed facts establish the following: Mr. Trotter fled from an initial traffic stop at Walmart which led to a high-speed chase that lasted approximately 7 minutes over approximately 5.6 miles in the middle of the day with heavy civilian traffic. Before approaching the vehicle, officers repeatedly instructed Mr. Trotter to put his hands in the air and to keep them there. But Mr. Trotter put his hands up and down, wavering in his compliance with the officers'

commands. Officers Anderson and Logan became aware that Mr. Trotter kept scooting up in his seat and reaching for his waistband and suspected that he had a weapon. Despite the officers' commands to stop reaching, Mr. Trotter reached into his waistband several times over a span of six seconds when the single shot was fired by Officer Logan. *See Horton v. Pobjecky*, 883 F.3d 941, 944, (7th Cir. 2018) ("When video footage firmly settles a factual issue, there is no genuine dispute about it.").

These undisputed facts are sufficient to show an imminent danger to the officers, and specifically to Officer Logan, who appeared to be less than 10 feet away from the driver side door of the Altima where Mr. Trotter was positioned. *See* dkt. 62-1 at Ex. A; Ex. B.

Even viewing the facts in the light most favorable to the Estate, the court cannot conclude that Officer Logan's use of deadly force was objectively unreasonable. Mr. Trotter ignored the officers' commands by putting his hands up and back down, *Johnson*, 576 F.3d at 659 ("[n]ot all surrenders, however, are genuine, and the police are entitled to err on the side of caution when faced with an uncertain or threatening situation"), and further, reaching for his waist when he was commanded to stop reaching showed active resistance. *Smith v. Finkley*, 10 F.4th 725, 738 (7th Cir. 2021) (reasoning suspect "not complying with [the officers'] repeated commands . . . demonstrated active resistance"); *see also DeLuna v. City of Rockford*, 447 F.3d 1008, 1012 (7th Cir. 2006) (noting that suspect's "refusal to heed th[e] demands" to stop and raise his hands "and his continued approach towards [the officer] posed a danger to [the officer]"). Further, the close proximity between Officer Logan and Mr. Trotter is also significant. *See McKnight v. Taylor*, 210 F. Supp. 3d 1069, 1075–76 (S.D. Ind. 2016) (concluding the officer's use of deadly force was reasonable where the officer reasonably believed the object in the suspect's hand was a gun and the "close proximity" of less than 30 feet between suspect and officer "accelerated the speed at

which [the officer's] decision needed to be made").

The Estate cites to *United States v. Koon*, a Ninth Circuit case, where, following a chase, the plaintiff exited the vehicle pursuant to Officer commands but refused to lie on the ground. 34 F.3d 1416, 1424 (9th Cir. 1994). In *Koon* the plaintiff was struck with batons and stomped and otherwise beaten by police officers. *Id.* at 1425. The officers continued beating the plaintiff after his body made involuntary movements in response to the beating. *Id.* The Estate also cites to *Bayon v. Berkebile*, where the plaintiff fled an attempted robbery at a gas station and his vehicle was disabled by police, IMPD officers gave the plaintiff conflicting commands to show his hands and to show his identification. 29 F.4th 850, 852 (7th Cir. 2022). Mr. Bayon reached for his wallet, complying with an order, and police shot and wounded Mr. Bayon. *Id.*

But these cases are not analogous to the undisputed facts here. The Estate attempts to analogize the *Koon* case to argue that Mr. Trotter's movements were "clearly involuntary and in response to the vicious attack of a police K9." Dkt. 80 at 17. The Estate also attempts to analogize the *Bayon* case to argue that Mr. Trotter was given conflicting commands. *See* dkt. 80 at 19. But those arguments are simply not supported by the video evidence in this case.

There are three important items to note as it relates to the video footage of the events that occurred once the Altima was disabled and the officers surrounded Mr. Trotter. First, the officers ordered Mr. Trotter to get out of the vehicle before they used the K-9, but he did not comply. Ex. A at 11:00-11:15. Second, the officers did not issue contradictory commands. They only told him to show his hands (and to keep them up) and to get out of the car. Mr. Trotter did not comply with those commands. Ex. A at 11:15-11:50 (showing Mr. Trotter put his hands up and back down three times, and then reaching down and around near the passenger seat). Finally, when Officer Logan fired off a single shot, Mr. Trotter was reaching for his waist, not fending off a K-9. Ex. B at 12:15-

12:27 (showing the K-9 is no longer near Mr. Trotter but he nevertheless reaches numerous times to his waist in the span of six seconds).

The officers never instructed Mr. Trotter to do anything other than get out of the car, and then to put and keep his hands in the air, both of which Mr. Trotter failed to comply with. The court finds that the video footage reveals Mr. Trotter to be an immediate threat to officer safety, and the second *Graham* factor weighs in Officer Logan's favor.

### 3. Resisting or fleeing

#### a. Initial apprehension, flight, and subsequent car chase

Officer Logan argues that Mr. Trotter refused and resisted lawful commands beginning with the initial traffic stop in the Walmart parking lot where he refused to roll down his window and sped away. Ex. A at 3:42-4:02. The court agrees—Mr. Trotter was instructed to roll down his window at least three times but did not comply and sped off quickly. *Id.*

It is undisputed that a lengthy high-speed chase ensued that involved Mr. Trotter driving erratically, into oncoming traffic, over medians, through busy parking lots and pedestrian areas. No doubt his actions endangered his own safety, the safety of officers involved, and, importantly, the safety of the public. Ex. A at 4:00-11:00.

"'[O]utrageously reckless driving' that 'pose[s] a grave public safety risk' can be enough to justify the use of deadly force under some circumstances." *Ybarra v. City of Chicago*, 946 F.3d 975, 979 (7th Cir. 2020) (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 777 (2014)). These cases involve officers using deadly force to apprehend a fleeing motorist while the suspect was driving, but the similarities between these scenarios and the instant case guide the court's analysis related to the resisting and fleeing *Graham* factor.

The dashcam footage clearly illustrates that Mr. Trotter's flight from the initial arrest in the

Walmart parking lot and subsequent erratic driving posed an actual and imminent threat to the lives of any pedestrians present, to other civilian motorists, and to the officers involved. *Scott*, 550 U.S. at 383-84, 379-80 (holding officer did not violate Fourth Amendment by ramming car of a fugitive who raced down narrow, two-lane roads in the dead of night at high speeds); *see also Plumhoff*, 572 U.S. at 777 (holding officer acted reasonably when he fatality shot a fugitive who was "intent on resuming" a chase that "pose[d] a deadly threat for others on the road.")

Much like the fleeing motorist in *Scott*, the video footage shows Mr. Trotter "swerve around more than a dozen other cars, cross the double-yellow line, and force cars travelling in both directions to their respective shoulders to avoid being hit." 550 U.S. at 379. Likewise, "we see [the Altima] run multiple red lights and travel for considerable period of time in the occasional center left-turn-only lane, chased by numerous police cars forced to engage in the same hazardous maneuvers just to keep up." *Id.* at 379-80.

And like the fleeing motorist in *Plumhoff* where the chase exceeded 100 miles per hours and lasted over five minutes, Mr. Trotter exceeded speeds of 90 miles per hour and dragged civilian motorists and officers from three law enforcement agencies on a chase that lasted approximately seven minutes.

Mr. Trotter's resisting and fleeing led the law enforcement officers through an extremely dangerous chase, and the officers had every reason to believe that Mr. Trotter would continue to resist arrest or flee and continue to endanger nearby civilians. *See* dkt. 74-1, Civilian Video Lawrence_000728.mp4 (illustrating that civilians were close enough to the disabled Altima to shoot video footage in a nearby parking lot).

The Estate presented no argument to address the resisting or fleeing arrest factor as it relates to the initial encounter with police in the Walmart parking lot or subsequent car chase. *See* dkt. 80.

16

There is no doubt that Mr. Trotter's actions in fleeing the initial traffic stop and engaging in a high-speed chase for nearly six miles put himself, civilian motorists, and law enforcement in harm's way.

### b.  Events immediately before shots were fired

The court next addresses the parties' arguments regarding the incidents that occurred when the Altima was stuck on a grassy berm and officers sought to extract him from his vehicle.

Officer Logan argues that Mr. Trotter did not exit the vehicle as officers ordered him to do so and otherwise failed to comply officer commands. Dkt. 64 at 13.

The Estate argues that Mr. Trotter was surrendering and not actively resisting. Dkt. 80 at 11. In support, it argues that "the evidence is equally clear and undisputable that [Mr.] Trotter was attempting to comply with the officers' numerous and, at times, conflicting commands prior to law enforcement's use of the police K-9." *Id.*

The court agrees that the video footage does depict that Mr. Trotter had his hands up (and down) at times prior to officers approaching the vehicle and using the K-9. Ex. A at (hands up, at 11:15, down at 11:20, up at 11:22, and down at 11:25). Mr. Trotter did not put his hands back up, despite an officer yelling "put your hands up" twice, and "hands" twice. *Id.* at 11:25-11:40. Officer Logan yelled "put your hands in the air, keep them there" and Mr. Trotter put his hands up, *id.* at 11:48, and then back down again. *Id.* at 11:50.

But the evidence does *not* show that Mr. Trotter put his hands up and kept them there, in compliance with Officer Logan's direct command.

The Estate also argues that Mr. "Trotter had a very large police dog on top of him and blocking his only means of egress." Dkt. 80 at 12. But the Estate fails to acknowledge what the video depicts after the dog is no longer anywhere near Mr. Trotter. Dkt. 62-1 Ex. B at 12:21.

17

As discussed above, in the ten-second span after the K-9 was pulled away from the vehicle, Mr. Trotter reached to his waistline area several times. *Id.* at 12:21-12:27; *see also* screenshots. During this time, Officer Logan stated "hey, he got a gun" and Officer Anderson yelled "stop reaching." Ex. I at 9:00-9:10. When Mr. Trotter did not comply with this command, Officer Logan fired one shot which struck Mr. Trotter in the abdomen. Ex. B at 12:28; Ex. I at 9:10-9:11.

The officers were not required to assume a possible intent to surrender in the split seconds after Mr. Trotter disobeyed their command to stop reaching. *See Johnson*, 576 F.3d at 660 (finding force was reasonable even though a few seconds earlier, suspect raised his arms and said "I give up"). The undisputed evidence shows that Mr. Trotter did not comply with the direct, non-conflicting officer commands immediately prior to and contemporaneous with the shot firing.

The court finds that the third and final *Graham* factor weighs in favor of Officer Logan. Further, the sum of Mr. Trotter's actions reveal that he was actively resisting arrest and/or trying to flee by failing to comply with officer commands both at Walmart and the car chase that ensued, and where his vehicle was disabled.

Based on the ample video footage in this case, the court finds that the *Graham* factors weigh in favor of Officer Logan. Certainly, it is unfortunate that Mr. Trotter ultimately died from the use of force, but no reasonable jury could find that Officer Logan acted unreasonably under the circumstances. Accordingly, Officer Logan's actions were objectively reasonable in light of the circumstances, and he is entitled to summary judgment on the excessive force claim against him.

**B.  *Monell* claim against the City of Lawrence**

In order to maintain a § 1983 claim against the City of Lawrence, the Estate must show that its constitutional rights were violated by a policy or custom of the City. *Monell v. Dep't. of Social Services*, 436 U.S. 658, 694−95 (1978). "The critical question under *Monell* is whether a

18

policy or custom of a municipal entity caused a constitutional deprivation." *Gonzalez v. McHenry Co., Ill.*, 40 F.4th 824, 829 (7th Cir. 2022).

For *Monell* liability to attach, the Estate must first show that it was deprived of a federal right, and then that the deprivation was caused by a City custom or policy or failure to implement a needed policy. *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 235 (7th Cir. 2021). Further, to the extent that Plaintiff is challenging a facially lawful policy (express or implied), it must provide evidence of a "pattern of similar constitutional violations resulting from the policy." *Helbachs Café LLC v. City of Madison*, 46 F.4th 525, 530 (7th Cir. 2022) (cleaned up). If challenging an unconstitutional municipal practice or custom, the plaintiff must show "evidence that the identified practice or custom caused multiple injuries." *Id.* (cleaned up).

The Amended Complaint contains a cause of action against the City of Lawrence which is based on allegations that Officer Logan was not fit to serve and posed a danger to the general public, and the City was deliberately indifferent to or otherwise condoned Officer Logan's conduct by deploying him as a police officer for the City. Dkt. 59 at 7. Stated differently, the Estate focuses its *Monell* claim against the City on an alleged policy or custom of keeping Officer Logan employed and active on duty. *Id.* But the *Monell* claim does not allege any facts regarding the conduct of any other actor, and the court has already found that Officer Logan's use of force was objectively reasonable in light of the circumstances.

The Estate therefore fails on the first prong of its *Monell* claim against the City. As previously established, it has not proved that it was deprived of a federal right as it relates to the excessive force claim against Officer Logan. Because Officer Logan did not commit a constitutional violation, the City cannot be held liable under *Monell* for damages for such violation.

*See Jenkins v. Bartlett*, 487 F.3d 482, 492 (7th Cir. 2007). Accordingly, summary judgment must be granted for the City of Lawrence on the *Monell* claim against it.

### C.  State-law claims

With the Estate's constitutional claims staged for dismissal, the court has discretion whether to exercise supplemental jurisdiction over his remaining state-law claims. 28 U.S.C. § 1367(c) ("The district courts may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction . . . ."); *see also Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009) ("A district court's decision whether to exercise supplemental jurisdiction after dismissing every claim over which it had original jurisdiction is entirely discretionary."). "Indeed, when the federal claims are dismissed before trial, *there is a presumption* that the court will relinquish jurisdiction over any remaining state law claims." *Dietchweiler by Dietchweiler v. Lucas*, 827 F.3d 622, 631 (7th Cir. 2016) (emphasis added).

When deciding whether to exercise supplemental jurisdiction, "'a federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity.'" *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 173 (1997) (internal quotation marks and quoted authority omitted).

In the Seventh Circuit, "the usual practice is to dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial." *Groce v. Eli Lilly*, 193 F.3d 496, 501 (7th Cir. 1999); *see also Sharp Elecs. v. Metropolitan Life Ins.*, 578 F.3d 505, 514 (7th Cir. 2009) ("Normally, when all federal claims are dismissed before trial, the district court should relinquish jurisdiction over pendent state-law claims rather than resolving them on the merits.") (internal quotation marks and quoted authority omitted). Exceptions to the general

rule exist: "(1) when the statute of limitations has run on the pendent claim, precluding the filing of a separate suit in state court; (2) substantial judicial resources have already been committed, so that sending the case to another court will cause a substantial duplication of effort; or (3) when it is absolutely clear how the pendent claims can be decided." *Davis v. Cook County*, 534 F.3d 650, 654 (7th Cir. 2008) (internal quotation marks and quoted authority).

No circumstance in this case overcomes the presumption that the court should relinquish jurisdiction over the Estate's state-law claims.

The statute of limitations is not a factor. Both federal and state law toll the relevant limitation period when claims are pending in a civil action (except in limited circumstances not present here). *See* 28 U.S.C. § 1367(d); Ind. Code § 34-11-8-1; *see also Hemenway v. Peabody Coal Co.*, 159 F.3d 255, 266 (7th Cir. 1998).

The court has not expended significant resources on the pending state-law claims. The court does not expect that the parties' discovery and briefing efforts with respect to the state law claims will go to waste. Rather, the evidence and legal research they have uncovered should be every bit as relevant in a state-court proceeding.

Further, it is not absolutely clear how the state-law claims should be resolved. The outcomes of the Estate's assault, battery, or *respondeat superior* claims are not so obvious as to weigh in favor of the federal court retaining jurisdiction, which is evidenced by the volume of briefing related to the state law claims. Finally, comity always favors allowing state courts to decide issues of state law. Having resolved all claims within its original jurisdiction, the court exercises its discretion and relinquishes supplemental jurisdiction over the Estate's assault, battery, and *respondeat superior* claims.

### V.     Conclusion

For the foregoing reasons, Defendants' motions for summary judgment, dkt. [61], is **granted.** All other pending motions, dkts. [77] and [86], are **denied as moot**. Final judgment shall now issue.

**IT IS SO ORDERED.**


Date: 9/16/2025

RICHARD L. YOUNG, JUDGE
United States District Court
Southern District of Indiana


Distribution:

All Electronically Registered Counsel